**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**(NORFOLK DIVISION)**

| | |
|---|---|
| Jeremiah Poole,<br><br>                                       Complainant,<br><br>v.<br><br>Union Pacific Railroad Co.,<br><br>                                       Respondent. | Case No: _____<br><br>**COMPLAINT** |

**INTRODUCTION**

1.      In 2007, Congress held four public hearings, which demonstrated that railroads frequently put productivity ahead of safety and retaliate against employees who refuse to so do, namely by disparately applying vague workplace rules against them. *See*, *e.g.*, *Impact of Railroad Injury, accident, and Discipline Policies on the Safety of America's Railroads: Hearings Before the H. Comm. On Transportation and Infrastructure*, 10th Cong. (Oct. 25, 2007) ("Hearings"). For this reason, Congress amended the Federal Railroad Safety Act, 49 U.S.C. § 20109 ("FRSA"), adding new prohibitions against railroads, providing employees a private right of action in federal court, and relaxing the standards of proof for retaliation claims. *See*, *e.g.*, The Implementing Recommendations of the 9/11 Comm. Act of 2007, P. L. 110-53, 121 Stat. 444 (Aug. 3, 2007). Courts have recognized that these amendments "were intended to 'enhance the oversight measures that improve transparency and accountability of the railroad carriers' and that '[t]he intent of this provision is to ensure that employees can report their concerns without the fear of possible retaliation or discrimination from employers.'" *Araujo v.*

1

*New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152, 157 (3d Cir. 2013) (quoting H.R. Rep. No. 110–259 at 348 (2007) (Conf. Rep.), 2007 U.S.C.C.A.N. 119, 181).]

2.      Complainant Jeremiah Poole has been a victim of the type of retaliation the above-described amendments were intended to address. He was a longtime and loyal employee of Respondent Union Pacific Railroad Co. who was terminated for reporting safety concerns. In short, Union Pacific has done exactly what the FRSA prohibits, and Poole has a right to be made whole.

## PARTIES

3.      Poole has worked for Union Pacific since 2006.

4.      Union Pacific provides freight rail transportation services across the country.

## VENUE

5.      The Court has jurisdiction over Poole's claims under 28 U.S.C. § 1331.

## FACTUAL ALLEGATIONS

6.      Poole has a reputation for being a particularly safety-conscious employee.

7.      Years prior to the incidents at issue in this case, Poole's managers asked him to turn in safety complaints to them and give them an opportunity to remedy his concerns before reporting his concerns to the company.

8.      Until December of 2017, Poole did as his managers asked.

9.      By December of 2017, however, Poole found that his managers were no longer addressing his concerns.

10.     Poole therefore informed his managers that he intended to begin again reporting his safety concerns to the company, including a concern about the workplace being inadequately lit.

2

11.     Shortly thereafter, Poole's managers charged him with a workplace rule violation for cars that had been left in the foul.[1]

12.     Poole's managers knew or should have known before they charged hi that Poole was not the employee responsible for the cars having been left where they were left.

13.     Poole's managers offered Poole a waiver, whereby he could accept informal discipline and waive his right to a hearing.

14.     Poole's managers told Poole that if he did not waive his right to a hearing, they would more harshly discipline him.

15.     While the hearings are more of a procedural than a substantive hurdle to Union Pacific disciplining employees for supposed work-place rule violations,[2] managers with supervisory authority over the charged employee preside over and read the transcript from them, which means that the right to a hearing that will necessarily entail an employee testifying about a safety concern is protected activity under the FRSA.

16.     Poole refused to accept responsibility for a rule violation he did not commit and therefore insisted on his right to a hearing.

---

[1] Pursuant to his union's collective bargaining agreement with Union Pacific, Poole had a right to a hearing before he can be disciplined for a workplace rule violation.

[2] The hearings are not a neutral forum where an employee's responsibility for a safety violation is fairly and independently determined, and are instead a perfunctory means to assign blame to employees regardless of their actual responsibility for safety violations. For example, hearing officers—who act as both prosecutor and judge—are members of management who are appointed by the company; hearing officers have no legal training; charged employees do not have legal counsel present; the rules of evidence do not apply and employees are frequently found responsible based entirely on hearsay; the company can compel witnesses to appear but employees cannot; the company conducts an investigation prior to the hearing but does not provide any discovery-not to mention exculpatory evidence-to the charged employee; and the hearings typically take less than one day. Indeed, it is well known that hearings almost always are decided in favor of the railroad.

17.     After a kangaroo-court hearing, Poole's managers found Poole guilty of leaving cars in the foul even though the hearing demonstrated that it was other employees who were responsible for leaving the cars where they had been left.

18.     Poole's managers disciplined Poole more harshly than they had offered with the waiver.

19.     Poole's managers disciplined Poole more harshly for no other reason than he had insisted on his right to a hearing.

20.     Around the same time they charged him with Poole with the bogus workplace rule violation for cars being left in the foul, Poole's managers began birddogging and falsely accusing him of workplace rule violations.[3]

21.     For example, on January 4, 2018, Poole's managers accused him of a red zone violation.

22.     When they learned Poole had not committed the violation,[4] Poole's managers dropped the issue and instead chastised Poole for not following Rule 7.4, which requires

---

[3] Union Pacific's collective bargaining agreement with Fritz's union prevents it from disciplining employees unless they commit a workplace rule violation that rises to a certain level of seriousness. In theory, this lessens the authoritarian-type control railroads have historically wielded over their employees; however, Union Pacific has developed an end-around to this problem. Specifically, it has instituted a voluminous set of vague workplace rules, which are arguably violated—in one way or another—by every employee on a daily basis. Indeed, when a union ensures that all of its members follow the letter of each rule, it engages in a "work-to-rule" campaign, which constitutes a strike under the Railway Labor Act because little to no work can actually be done. *See*, *e.g.*, *United Air Lines, Inc. v. Air Line Pilots Ass'n*, 2008 U.S. Dist. LEXIS 94750, at *65 (N.D. Ill. Nov. 17, 2008). Union Pacific can therefore follow around an employee of whom it wants to be rid, watching him or her until it observes a workplace rule violation. This is known as "birddogging," a practice with which Union Pacific's employees are familiar. While this seems bizarre outside of the railroad industry, the FRSA was amended exactly because railroads were birddogging employees who objected to railroads' violations of federal regulations. *See*, *e.g.*, *Impact of Railroad Injury, Accident, and Discipline Policies on the Safety of America's Railroads: Hearings Before the H. Comm. on Transportation and Infrastructure*, 110th Cong. 84 (2007).

employees to "[b]efore coupling to or moving cars or engines, verify that the cars or engines are properly secured and can be coupled and moved safely."

23.    It was common knowledge that Rule 7.4 applies only to certain moves, which did not include the move Poole was performing on January 4, 2018.

24.    Poole therefore asked for clarification regarding whether Rule 7.4 applied to every move.

25.    Poole's managers then told him that Rule 7.4 applies to every move.

26.    Thereafter, before each move, Poole verified that the cars and engines were properly secured and could be coupled and moved safely, *i.e.*, Poole followed Rule 7.4 to the letter.

27.    Poole's managers then accused Poole of willful compliance, now telling him that Rule 7.4 does not apply to every move and that he was slowing down productivity.

28.    Because his managers had responded to him reporting a safety concern by birddogging him and were giving him conflicting instructions on Rule 7.4, Poole felt that he was in a no-win situation, whereby his managers could and would discipline him not only if he did not follow the rules but also if he did follow the rules.

29.    Poole therefore filed a complaint with Union Pacific against his managers.

30.    Poole's managers responded by increasing the intensity of their birddogging of Poole and falsely accusing him of workplace rule violations.

31.    Poole's managers also told Poole that if he continued to follow Rule 7.4 to the letter, they would find a reason to fire him.

32.    Poole therefore stopped following Rule 7.4 for every move.

---

[4] Shortly before accusing Poole of the violation, his managers had witnessed another employee commit a red-zone violation. Poole's managers should have immediately stopped that employee. Instead, they waited until they believed Poole had committed a violation to intervene.

33. Things came to a head on May 9, 2018, when Poole participated in a move that resulted in some cars rolling free.

34. It was the negligence of other employees that resulted in the cars rolling free.

35. The only responsibility Poole bore for the cars rolling free was his not having followed the letter of Rule 7.4.

36. Poole's managers nevertheless charged only Poole with a workplace rule violation and terminated him.

37. When asked why they were treating Poole in such manner, Poole's managers admitted to Poole's union representative that it was because Poole had been reporting safety concerns.

## CAUSES OF ACTION

### VIOLATIONS OF 49 U.S.C. § 20109(a)(1)

38. The FRSA prohibits railroad carriers from demoting, suspending, reprimanding, or in any other way discriminating against an employee for engaging in protected activity. Protected activity includes "provid[ing] information, directly caus[ing] information to be provided, or otherwise directly assist[ing] in any investigation regarding any conduct which the employee reasonably believes constitutes a violation of any Federal law, rule, or regulation relating to railroad safety or security . . . ." 49 U.S.C. § 20109(a)(1).

39. Poole engaged in protected activity by reporting safety concerns in December of 2017, including a concern about the workplace being inadequately lit; refusing to waive his right to a hearing; engaging in a colloquy Rule 7.4; and reporting to Union Pacific that his managers were harassing him.

40. Union Pacific knew Poole had engaged in protected activity when it took adverse actions against him.

6

41.     Union Pacific took adverse actions against Poole when it birddogged him, threated him, charged him with workplace-rule violations, and suspended and terminated him.

42.     Poole's protected activity was a contributing factor in Union Pacific's decision to take the above-referenced adverse actions against him. In fact, the adverse actions against Poole resulted directly from his protected activity.

### VIOLATIONS OF 49 U.S.C. § 20109(a)(2)

43.     The FRSA prohibits railroad carriers from demoting, suspending, reprimanding, or in any other way discriminating against an employee for engaging in protected activity. Protected activity includes "refus[ing] to violate or assist in the violation of any Federal law, rule, or regulation relating to railroad safety or security[.]" 49 U.S.C. § 20109(a)(2)

44.     Poole engaged in protected activity by reporting safety concerns in December of 2017, including a concern about the workplace being inadequately lit; refusing to waive his right to a hearing; engaging in a colloquy Rule 7.4; and reporting to Union Pacific that his managers were harassing him.

45.     Union Pacific knew Poole had engaged in protected activity when it took adverse actions against him.

46.     Union Pacific took adverse actions against Poole when it birddogged him, threated him, charged him with workplace-rule violations, and suspended and terminated him.

47.     Poole's protected activity was a contributing factor in Union Pacific's decision to take the above-referenced adverse actions against him. In fact, the adverse actions against Poole resulted directly from his protected activity.

### VIOLATIONS OF 49 U.S.C. § 20109(b)(1)(A)

48.     The FRSA prohibits railroad carriers from demoting, suspending, reprimanding, or in any other way discriminating against an employee for engaging in protected activity. Protected activity includes "reporting, in good faith, a hazardous safety or security condition[.]"

49.     Poole engaged in protected activity by reporting safety concerns in December of 2017, including a concern about the workplace being inadequately lit; refusing to waive his right to a hearing; engaging in a colloquy Rule 7.4; and reporting to Union Pacific that his managers were harassing him.

50.     Union Pacific knew Poole had engaged in protected activity when it took adverse actions against him.

51.     Union Pacific took adverse actions against Poole when it birddogged him, threated him, charged him with workplace-rule violations, and suspended and terminated him.

52.     Poole's protected activity was a contributing factor in Union Pacific's decision to take the above-referenced adverse actions against him. In fact, the adverse actions against Poole resulted directly from his protected activity.

## **REQUEST FOR RELIEF**

53.     Poole requests that the Court find Union Pacific acted in direct violation of the FRSA.

54.     Poole further requests that the Court order Union Pacific to:

- clear and/or expunge any record of misconduct by him regarding his alleged work-place rule violations;

- pay to him an award for compensatory damages arising from loss of income and benefits in an amount to be determined by the trier of fact;

- pay to him an award for garden-variety emotional distress in an amount in an amount to be determined by the trier of fact;

- pay to him an award for costs (including litigation and expert costs), disbursements, and attorneys' fees; and

- pay to him an award for $250,000 for punitive damages.

55.     Poole further requests that the Court order judgment against Union Pacific for all other relief available under the FRSA and such other relief as the Court deems just and equitable.

<strong>THE MOODY LAW FIRM</strong>

Dated: February 19, 2020

s/ *Nicholas D. Thompson*
Nicholas D. Thompson
nthompson@moodyrrlaw.com
500 Crawford Street, Suite 200
Portsmouth, VA 23704
(757) 673-9161 Work
(757) 397-7257 Fax

**ATTORNEYS FOR PLAINTIFF**